IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 18, 2004 Session

**R. L. LOVE**

v.

**AMERICAN FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES LOCAL 1733, AND
WILLIE JOE ALEXANDER**

**An Appeal from the Circuit Court for Shelby County
No. 300277     John R. McCarroll, Jr., Judge**

———————

**No. W2003-01554-COA-R3-CV - Filed November 1, 2004**

———————

This is a claim against a union for negligence. The plaintiff was a correctional officer at a county correctional facility and a member of the defendant union. The employee was terminated from his job after he was arrested for possession of a controlled substance. The employee sought the union's assistance in appealing his termination through the county grievance process. After his grievance was preliminarily denied, the union had fifteen days in which to appeal the denial by requesting arbitration of the employee's case. The employee urged the union to file a request for arbitration, and the defendant union officer agreed to do so. However, the defendant union officer failed to submit the request for arbitration by the deadline, and consequently the request was denied as untimely. The employee then sued the union and the union officer, alleging that the union officer's conduct was negligent and that it constituted a breach of contract. After a bench trial, the trial court rejected the employee's breach of contract claim. It concluded that the defendants' failure to request arbitration in a timely manner was negligent, but that the negligence did not cause the employee's damages. The employee now appeals. We affirm the dismissal of the breach of contract claim, but reverse the dismissal of the negligence claim, finding that the evidence preponderates against the trial court's conclusion that the employee failed to prove causation of his damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is
Affirmed in Part and Reversed in Part**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Kenneth P. Jones, Memphis, Tennessee, for the appellant, R. L. Love.

Murray B. Wells, Memphis, Tennessee, for the appellee, American Federation of State, County and Municipal Employees Local 1733.

Willie Joe Alexander, appellee, *pro se*.

## OPINION

From November 1989 until his termination on June 30, 1998, Plaintiff/Appellant R. L. Love ("Love") was employed by Shelby County, Tennessee, as a correctional officer at the Shelby County Correctional Center in Memphis ("Penal Farm"). As a correctional officer, Love was a dues-paying member of Defendant/Appellee American Federation of State, County and Municipal Employees Local 1733 ("the Union"). Defendant/Appellee Willie Joe Alexander ("Alexander") served as President and/or Acting Director of the Union. Alexander was in charge of the day-to-day operations of the Union.

Mid-morning on June 5, 1998, Love was stopped in his car by a police officer in Memphis for disregarding a stop sign.[1] On the front seat of Love's vehicle, the police officer observed what turned out to be a marijuana cigarette. Love was arrested and charged with disregarding a stop sign as well as for possession of a controlled substance. Later that day, Love was released without bond. Love called his supervisor at the Penal Farm to inform him of the arrest. Love was later suspended without pay from his job at the Penal Farm based on the seriousness of the charges against him.

The administrative grievance process for employees of the Penal Farm is outlined in the Memorandum of Understanding ("MOU") between the Shelby County Government Correction Center ("County") and the Union. The MOU is a voluntary agreement designed "to assure harmonious relations between the County and the Union and to provide for peaceful adjustment of differences which may arise related to wages, hours and other working conditions of employment consistent with the Labor Policy of Shelby County." While the MOU is not an enforceable contract, it represents the understanding between the Union and the County.

On June 7, 1998, pursuant to the grievance procedure outlined in the MOU, Union Steward Lillie Wilson filed a grievance on Love's behalf with the County. On June 15, 1998, Love received notification that a "Loudermill hearing"[2] would be held to determine whether his employment would be terminated. The Loudermill hearing was conducted on June 18, 1998, and the Department determined that Love's employment would be terminated effective June 30, 1998. The stated bases for his termination were willful disregard of lawful orders and violation of administrative policies

---

[1]Love was 54 years old at the time of the incident.

[2]The Loudermill hearing is the first hearing in the grievance process, in which the employee is given the opportunity to present reasons why he should not receive the proposed discipline.

and procedures. It is undisputed that this arose solely out of the marijuana found in Love's car. At the time his employment was terminated, the criminal charges against Love were still pending in Shelby County criminal court.

On July 6, 1998, the Union filed another grievance on Love's behalf, known as a "Step III" grievance, referring to the third step in the grievance process outlined in the MOU.[3] The grievance asserted that Love was wrongfully terminated because he had not yet been convicted of the criminal charges against him, and requested that Love's termination be canceled, that all charges against him be dropped, and that all documentation regarding the termination be removed from his employment file. In the grievance, Love also sought reinstatement, as well as his lost wages for the time during which he was suspended.

On July 27, 1988, the County held a Step III hearing on Love's grievance. The County denied the grievance in a letter dated August 5, 1998, addressed to Union Director Dorothy Crook. The letter was faxed to the Union that day, and it is undisputed that the Union received the faxed letter. At this time, the criminal charges against Love were still pending in Shelby County criminal court.

Under the terms of the MOU, after the denial of Love's Step III grievance, the Union had seven (7) business days from the date of the denial within which to appeal the matter to the Shelby County Civil Service Merit Board ("Merit Board") for review, or, in the alternative, fifteen (15) business days in which to request arbitration of Love's termination. The MOU provides that only the Union can request arbitration; the County would not accept a request for arbitration from an individual member.

On August 11, 1998, Love received a copy of the August 5, 1998 letter to the Union denying his claim. The next day, on August 12, 1998, Love went to the Union hall and met with Alexander, the Union's President and Acting Director. In this meeting, Love formally requested that the Union submit his termination to arbitration or to the Merit Board for review. Love told Alexander that he was willing to appeal the termination through either route, but that he preferred arbitration. Love reminded Alexander that the time for appeals had begun to run. Alexander told Love that he had just finished preparing some cases for the Merit Board, and assured Love that he would call to set up his appeal. Love asked Alexander if there was anything else for Love to do to expedite the matter, but Alexander said no, that he would take care of it.

---

[3]In the first step of the process, or Step I, the union steward brings an oral grievance to the county shift commander on behalf of the employee within five working days of the incident at issue. The shift commander must consider the grievance and make a decision. If the employee is dissatisfied with the decision, he may proceed to Step II, which requires that the grievance be presented in writing to the operations manager or his designated representative. The operations manager reviews the grievance and issues a decision. If the employee is dissatisfied with the outcome in Step II, the aggrieved employee may proceed to Step III, where the grievance may be presented in writing to the Administrator of Security. The Administrator of Security then makes arrangements to meet with the Union, the grievant, and a management representative so that each will be afforded an opportunity to present his position on the matter.

A few days later, on August 18, 1998, the Shelby County criminal court dismissed the criminal charges against Love. Love had filed in the criminal court the affidavit of his nephew, Jasper Love, who admitted that the marijuana found in Love's car belonged to him, not to Love. Ultimately, Love paid a fine for disregarding the stop sign, and the charge of possession of a controlled substance was dropped. The record on Love's criminal charge was expunged.

In the meantime, Alexander, despite his assurances to Love, failed to make a timely request for review of Love's case with either the Merit Board or through arbitration. On September 15, 1998, well after the fifteen-day time limitation to request arbitration, Alexander belatedly sent a letter to the County seeking arbitration of Love's termination. On September 23, 1998, the County sent Alexander a letter denying the Union's request for arbitration as untimely. At that point, the termination of Love's employment became final.

On January 15, 1999, Love filed this lawsuit in the trial court below.[4] On November 2, 2002, Love filed an amended complaint against the Union and Alexander (collectively, "defendants"), alleging that they were negligent in failing to file a timely appeal of the termination of his employment. As a result of the defendants' negligence, Love asserted, the termination of his employment became final and he was precluded from seeking reinstatement, despite the fact that the criminal charges against him had been dismissed and his work record was exemplary. Consequently, Love contended, the defendants' negligence caused him to suffer monetary damages including, but not limited to, lost wages, lost employment benefits, pain, suffering, and mental anguish. Love also asserted a breach of contract claim against the defendants, claiming that, when Alexander promised to file an appeal on Love's behalf, the Union and Alexander "thereby entered into an agreement with Love to timely appeal his termination." The failure to do so, Love alleged, constituted a breach of that oral agreement.

On May 13 and 14, 2003, a bench trial was conducted. At the outset of the trial, the parties presented to the trial court thirty-three stipulated exhibits, which were entered into evidence. Among those documents was the MOU between the County and the Union, several favorable evaluations of Love's performance issued during Love's tenure at the Penal Farm, and copies of the grievances filed on Love's behalf and the ensuing grievance denials.

Also included in the stipulated exhibits were previous decisions of the Civil Service Merit Board, submitted to support Love's argument that, under established County policy, he would have been reinstated had his case been arbitrated. These previous decisions included a published order of the Merit Board regarding the case of correctional officer Jeffery Sorrells ("Sorrells"). The decision on Sorrells was dated March 4, 1998, shortly before Love's arrest. In that case, Sorrells had been suspended from work as a result of his arrest for assault. In the hearing on Sorrells, the Director of the Correction Center, Rob Sprecher, testified "that when a[] Corrections Officer is arrested for

---

[4]Love's initial complaint named the Shelby County Correction Center, Robert Sprecher, Robert Moore, and Jim Rout, Mayor of Shelby County, Tennessee, as additional defendants. Love later voluntarily dismissed those defendants. The amended complaint also included revised claims for relief.

a job related misdemeanor and charged with a crime, they are put on suspension without pay status pending final court action." Sprecher added that, "if the Petitioner is acquitted and the charges pending against the Petitioner are dismissed, the Petitioner will be returned to work with full backpay and seniority rights." Sorrells had requested that he be permitted to return to work until a final court action was rendered on his assault charge, consistent with the policy described by Sprecher. The Board granted Sorrells' request, stating that "the Correction Center has consistently followed their rules and regulations concerning an officer being arrested and charged with assault. It is also the opinion of the Board that if the Petitioner is acquitted and all charges pending against him are dismissed, the Petitioner will return to his position and receive full backpay and benefits."

The stipulated exhibits included several other recent Merit Board decisions. Some of the decisions demonstrated the Board's policy of reinstating an officer when the officer's criminal charges are dismissed, while others showed that the Board considered the employee's good work performance as a mitigating factor weighing in favor of granting the relief requested by the employee.

Several witnesses testified at trial. Love submitted the testimony of Danny Kail ("Kail"), the County's deputy administrator for human resources and the County employee overseeing employee labor relations at the time Love's termination was under consideration. Kail received Alexander's belated request for arbitration of Love's termination and denied it as untimely. Kail testified that the County followed a practice of suspending an officer without pay if he was arrested for a crime, and that the suspension would remain in effect until the criminal charges were resolved. If the charges were dismissed or dropped, Kail stated, the employee was ordinarily summoned back to work.

Kail was instrumental in drafting the MOU between the County and the Union, and indeed he "wrote most of it." Under the process outlined in the MOU, Kail testified, once an employee's grievance is denied in Step III of the grievance process, the union can request arbitration on behalf of the employee, or the employee can appeal to the Merit Board. If the employee asks the Union to arbitrate, the Union has a fiduciary duty to decide whether the case has sufficient merit to move forward. If the Union determines that the case has merit, it submits a request and the case then proceeds to arbitration. Kail testified that the arbitrator's decision is not binding on the County; rather, it is a recommendation to the County Mayor, who can accept or reject that recommendation.

The trial court also heard testimony from Warren Cole ("Cole"), a correctional officer at the Penal Farm and secretary of the Union at the time of Love's termination. Similar to Kail, Cole testified that normally, when an officer is arrested and charged with a criminal offense, he is suspended before the outcome of any court action on the criminal charges. In Love's case, Cole testified, he and Claude Elliott represented Love at the Step III grievance hearing. When the grievance was denied, Cole conceded, it was the Union's responsibility to request arbitration. Once arbitration is requested, Cole explained, a grievance committee meets to determine whether "it was a good and true grievance," and then votes to determine whether the case would be sent to arbitration. Cole acknowledged that it was Alexander's responsibility to request arbitration on

Love's behalf, and he recalled that Alexander told Love that Alexander had "it covered. Don't worry about it." Despite Alexander's assurances to Love, Cole testified, the request for arbitration of Love's termination was not processed. Cole said that Love "was a very dependable officer as well as being the chief steward. He led by example. I can't recall him being late for work any. I don't have any knowledge of any complaints from members of management concerning Mr. Love about his work ethics."

Another correctional officer at the Penal Farm, Lillie Wilson ("Wilson"), testified at trial. Wilson was a Union steward at the time of the events in question, and she explained that a steward was a Union member who listened to complaints of employees and helped them file grievances. Wilson testified that, at the time of Love's termination, he was a chief steward for the Union. So that Love would not have to file his own grievance, Wilson filed the Step III grievance on Love's behalf, but was not involved with his case after that point. Wilson observed that Love's job performance seemed to be good.

Love testified on his own behalf. Love noted at the outset of his testimony that his job performance evaluations had always been positive, as reflected in numerous job performance evaluations included in the stipulated exhibits. Love also described the events surrounding his arrest on June 5, 1998, and explained that the criminal charges against him were dismissed and his record was expunged. He claimed that very few officers are suspended without pay when they are charged with a crime but have not yet been convicted.

Love testified that he received a copy of the August 5, 1998 letter denying his Step III grievance on August 11, 1998, and that he visited Alexander the following day. At that meeting, Love said, he told Alexander that he wanted to go to arbitration. Love testified that Alexander assured him that he would "take care of it." Love said that, after that, he called Alexander's office periodically to make sure the paperwork was in process. Love later learned that the request for arbitration of the termination of his employment was not timely filed. Love asserted that, had he been given the opportunity to arbitrate, he believed that he would have been reinstated and made whole for all of his lost work time. Love testified that the ordeal had caused him stress, problems sleeping, and nervousness, and claimed that it also caused financial problems and problems in his marriage.

Alexander testified at trial, and, in addition, portions of his prior deposition testimony were read into the record. In his deposition, Alexander gave no justification for the Union's failure to file a request for arbitration on Love's behalf. He stated:

[Question]: [S]ince the union was aware of the [August 5, 1998 letter denying the Step III grievance], [shouldn't] the union have timely filed the arbitration or civil service review petition?
[Alexander]: I would agree with that, yes.
[Question]: Do you know why that did not happen?
[Alexander]: No, I don't.

At trial, Alexander admitted that Love asked him to file a request for arbitration, but suggested that by the time Love approached him to ask that the Union file a request for arbitration, such a request was already untimely and they both knew it. Alexander said that he nevertheless "obliged" Love by sending the belated letter. Alexander confirmed that, when a member wants arbitration, the Union's grievance committee determines whether the case is sufficiently meritorious for the Union to request arbitration, and if it is meritorious, the Union sends a letter requesting arbitration.

At the conclusion of the trial, the trial court issued a ruling from the bench. Initially, the trial court rejected Love's breach of contract claim, stating that there was no "breach of contract cause of action stated as such." With respect to the negligence claim, the trial court found that Love in fact met with Alexander on August 12, 1998, as Love had maintained, and that Alexander assured Love that "he would take care of it for him." Thereafter, the trial court concluded, the Union negligently failed to timely seek arbitration on Love's behalf. However, the trial court found that Love had not shown that the defendants' negligence caused any damage to him, because the proof did not show that, had Love gone through the arbitration process, the arbitration would have resulted in a ruling favorable to Love. The trial court analyzed it in a manner akin to a legal malpractice claim:

> [I]t's . . . two cases, a case within a case. . . .
> . . . [The defendants] did have a duty . . . to take steps that were normal according to all of the testimony to protect [Love's] rights in connection with the arbitration. . . . The proper steps were not taken to protect Mr. Love in connection with the arbitration. . . .
> [The defendants] dropped the ball. . . .
> The second case within a case is the question of what would have happened had they not dropped the ball. . . . [Love] has to prove it more probably than not that he would have prevailed [in the arbitration]. Based on all of the proof that I've heard I'm not convinced that Mr. Love has carried that burden of proof that he would prevail. There would have been numerous exhibits presented as to what happened, what his record was, all of this was presented to the various entities that reviewed his work record and so forth and they came up with termination.
> I can't say that [Love] proved to me that if he went through the process of arbitration . . . that the arbitration would have been in his favor or that the mayor would have acted in a way that was favorable to Mr. Love.

Thus, the trial court held that Love could not prove that the defendants' negligence caused his damages. On May 20, 2003, the trial court entered a judgment in favor of the defendants, consistent with its oral ruling. From that order, Love now appeals.

On appeal, Love argues that the evidence preponderates against the trial court's conclusion that the evidence was insufficient to show that he would have prevailed had his case been arbitrated. Love points out that, at the time he was terminated and at the time his Step III grievance was denied, he had not yet been absolved of the criminal charges against him. By the time his arbitration would have occurred, Love argues, his criminal charges were dismissed, his criminal record was expunged,

and there was no longer any basis on which the arbitration panel could have upheld his termination. Love argues that the evidence at trial showed that Shelby County maintained a policy of reinstating an officer to his original position with full backpay and benefits if he were suspended based on criminal charges for which the officer was later acquitted. Further, Love notes that the evidence is undisputed that his work record was exemplary, which would have further improved the chance that he would have been reinstated in an arbitration proceeding. In addition, Love contends that the trial court erred in rejecting his breach of contract claim. Therefore, Love argues, the trial court's decision should be reversed and the cause remanded for further proceedings related to damages.

In response, the defendants argue that the trial court should have applied the standard used in federal cases involving the breach of the duty of fair representation under the National Labor Relations Act ("NLRA"). Under the federal standard, to prove that a union breached its duty of fair representation to a union member, the plaintiff must show that the alleged breach was in bad faith, was discriminatory, or was arbitrary. *See Vaca v. Sipes*, 386 U.S. 171, 177-78 (1967). The defendants concede that the NLRA is inapplicable to the instant case, since Love was employed by a governmental entity.[5] They argue, however, that the federal standard should be applied in the instant case, rather than a simple negligence standard, so that a union representing governmental employees will not be held to a different standard of liability as other unions in an identical situation. Alternatively, the defendants argue, the trial court correctly concluded that Love did not prove that he would have succeeded in arbitration.

The trial court's findings of fact are reviewed *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. *Cross v. City of Memphis*, 20 S.W.3d 642, 645 (Tenn. 2000); Tenn. R. App. P. 13(d). Conclusions of law are reviewed *de novo*, with no such presumption of correctness. *Thurmon v. Sellers*, 62 S.W.3d 145, 151 (Tenn. Ct. App. 2001).

Love argues on appeal that the trial court erred in rejecting his breach of contract claim. Love claims that, when Alexander agreed to "take care of" appealing his termination at the August 12, 1998 meeting, this created an oral agreement in which Alexander agreed to timely appeal his termination. Love does not specify the terms of the agreement, nor does he identify any consideration given or bargained-for exchange between the parties. Furthermore, the evidence submitted at trial does not support Love's claim of the existence of a contract between him and the defendants. Under these circumstances, we affirm the trial court's conclusion that Love did not establish a breach of contract.

---

[5]Prior to the trial, the defendants filed a motion to dismiss, claiming that Love's lawsuit was preempted by the NLRA. On February 13, 2003, the trial court denied the motion to dismiss, concluding that federal law was inapplicable because the NLRA does not apply to employer-employee relations of any state or political subdivision thereof, citing *City of Alcoa v. Int'l B'hood of Elec. Workers Local Union 760*, 308 S.W.2d 476 (Tenn. 1957). The defendants now concede that Love's claim is not preempted, but argue that the standard applied in federal NLRA cases should apply to his claim.

As to Love's negligence claim, the defendants argue that the federal standard, applicable to federal cases involving the duty of fair representation under the NLRA, should be applied in the instant case to prevent disparate results between cases involving a non-governmental employer and a governmental employer. Whether the federal standard or a simple negligence standard should apply in such cases brought against the union by an aggrieved union member is an issue of first impression in Tennessee. The Union cites no other case applying this standard in a similar situation. Under the circumstances, where the NLRA is clearly not applicable, we decline to adopt the federal standard. Therefore, we apply a negligence analysis to this claim.

On appeal, the defendants do not dispute the trial court's finding that Love met with Alexander on August 12, 1998, within the time limit for filing a request for arbitration, that Alexander assured Love that he would "take care of it," and that the Union nevertheless failed to submit a request Love's behalf within the required time period. The trial court concluded that the Union had a duty to Love to protect Love's rights with respect to arbitration of his termination, and that the Union "dropped the ball" in failing to do so. This element of Love's claim is not in dispute on appeal. The focus, then, is the trial court's finding that Love did not carry his burden of proving that "more probably than not . . . he would have prevailed" had the request for arbitration been timely filed.

In proving a negligence claim, the plaintiff must establish both causation in fact and proximate, or legal, causation as necessary elements of his claim. *See Burroughs v. Magee*, 118 S.W.3d 323, 327-28 (Tenn. 2003). "Causation, or cause in fact, means that the injury or harm would not have occurred 'but for' the defendant's negligent conduct." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). Thus, "causation [in fact] refers to the cause and effect relationship between the tortious conduct and the injury." *Id.* Once cause in fact is established, the question becomes whether the defendant's negligence was the proximate cause of the plaintiff's injuries. *Id.* Determining proximate causation is a policy decision regarding whether to impose liability under particular circumstances when cause in fact has been established. *White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998). The Tennessee Supreme Court has explained the difference between cause in fact and proximate cause:

> The distinction between cause in fact and proximate, or legal, cause is not merely an exercise in semantics. The terms are not interchangeable. Although both cause in fact and proximate, or legal, cause are elements of negligence that the plaintiff must prove, they are very different concepts. Cause in fact refers to the cause and effect relationship between the defendant's tortious conduct and the plaintiff's injury or loss. Thus, cause in fact deals with the "but for" consequences of an act. The defendant's conduct is a cause of the event if the event would not have occurred but for the conduct. In contrast, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. Proximate or legal cause is a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct based upon considerations of logic, common sense, policy, precedent and "our more or less

inadequately expressed ideas of what justice demands or of what is administratively possible and convenient." (Citations omitted.)

***Snyder v. LTG Lufttechnische GmbH***, 955 S.W.2d 252, 256 n.6 (Tenn. 1997). The Court has also established a three-part test for determining whether proximate cause exists:

1. The defendant's conduct must have been a "substantial factor" in bringing about the harm complained of;
2. There is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and
3. The harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*See McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991); *see Kilpatrick* , 868 S.W.2d at 598 n.1, ***Brown v. Hamilton County***, 126 S.W.3d 43, 50 (Tenn. Ct. App. 2003). Thus, a defendant's negligence is the proximate cause of the plaintiff's injury if it was a substantial factor in causing an injury that could have reasonably been foreseen by an ordinary person. The negligence need not be the *only* cause of the plaintiff's injuries; it need only be a substantial factor. *See Roberts v. Robertson County Bd. of Edu.*, 692 S.W.2d 863, 871 (Tenn. Ct. App. 1985); ***Waller v. Skeleton***, 212 S.W.2d 690, 696 (Tenn. Ct. App. 1948). Both causation in fact and proximate cause must be proven by a preponderance of the evidence. ***Kilpatrick***, 868 S.W.2d at 598. Consequently, the relevant inquiry is whether or not the defendant's conduct "more likely than not" was a substantial factor in causing the plaintiff's injuries. *See id.* at 598-99. This standard is also applied in legal malpractice cases which, like the case at bar, require the plaintiff to prove "a case within a case." *See Metcalf v. Waters*, No. 02A01-9510-CV-00236, 1996 WL 622696, at *2 (Tenn. Ct. App. Oct 29, 1996), *rev'd on other grounds*, 970 S.W.2d 448 (Tenn. 1998) (recognizing that, in order to prove causation in a legal malpractice claim, plaintiff must show that he more probably than not would have prevailed in his underlying case, essentially proving a "case within a case"); ***Bruce v. Olive***, No. 03A01-9509-CV-00310, 1996 WL 93580, at *3 (Tenn. Ct. App. Mar. 4, 1996) (same); *see also Kilpatrick*, 868 S.W.2d at 602 (holding that, in a medical malpractice case, a finding that the defendant's negligence " 'might have' 'may have' [or] 'could have' " caused the injury is not enough; the plaintiff must prove that the negligence more probably than not caused the injury).

Therefore, the issue on appeal is whether the defendants' negligence in failing to protect Love's appeal "more likely than not" was a substantial factor in causing Love's termination to become permanent. Therefore, as correctly stated by the trial court, Love had the burden of proving that had the defendants not been negligent, i.e., had they timely requested arbitration, he "more likely than not" would have prevailed in the arbitration and would have been reinstated as a correctional officer.

In reaching the conclusion that Love did not meet his burden of proof, the trial court observed that Love's case had been "presented at various steps to the county and through the process," and he had failed to prevail at each of those steps. The trial court also found significant that the

arbitration process is advisory, rather than binding. The trial court noted that Love did not show that the Mayor would have approved the arbitration result or "acted in a way that was favorable to Mr. Love." Based on these facts, the trial court held that Love did not prove causation.

As the trial court observed, by the time Love received the August 5, 1998 letter denying his grievance and met with Alexander on August 12, 1998, he had gone through the third step of the County grievance process, to no avail. Shortly after that, however, on August 18, 1998, the criminal charges against Love were dismissed and Love's record was expunged, based on Love's proof that the marijuana found in his car did not belong to him. Once the criminal charges against Love were dismissed and his record expunged, this changed the picture drastically. At this point, no basis remained for Love's employment to be terminated.

At the time the criminal charges against Love were dismissed, the steps remaining in the appeal process were for the Union grievance committee to determine whether Love's request for arbitration was meritorious, for Love's case to be arbitrated and a recommendation by the arbitrator sent to the County Mayor, and for the County Mayor to determine whether Love should be reinstated. The evidence at trial indicated that the Union's grievance committee is not obligated to file a request for arbitration if it determines that the employee's case is not meritorious. However, since the Union in fact filed a request for arbitration, albeit an untimely one, this indicates that the Union grievance committee found Love's case meritorious. If the Union in fact requests arbitration, the result of the arbitration depends on the individual arbitrator. Finally, if the arbitrator recommends reinstatement of the employee, his recommendation is advisory and the County Mayor may decide nevertheless to deny reinstatement.

The trial court in this case rightly took into account the uncertainty involved in arbitration and the possibility that the County Mayor would not follow an arbitrator's recommendation of reinstatement. However, the evidence on the County's practice of reinstating employees whose criminal charges are dismissed, as well as the evidence of Love's exemplary work record, was strong and unrefuted. Danny Kail, the County's deputy administrator for human resources and its chief negotiator with the unions, testified that the corrections center's practice, if an employee was suspended from work because of an arrest, and the criminal charges were later resolved in favor of the employee, was that the employee "would be summonsed back to work." This was corroborated by the Civil Service Merit Board's decisions regarding correctional employee Jeffery Sorrells, in which the director of the corrections center testified that if a corrections employee is arrested while off duty and the charges are later dismissed, the employee would "be returned to work with full backpay and seniority rights." The defendants offered no evidence to the contrary. Love also submitted evidence that he enjoyed an exemplary work record over the eight and one-half years he served as a correctional officer, and that officers with such records were given favorable consideration in disputes over punishment for first-time criminal offenses. Again, that evidence was unrefuted.

Thus, the undisputed evidence showed that Love had an exceptionally strong case for reinstatement. He was arrested off-duty for a non-violent offense, possession of a controlled

substance; it was his first criminal arrest; the charges were dismissed because the owner of the controlled substance admitted culpability; Love's record was expunged, and he was a long-term employee with an outstanding record of job performance. Apart from the vagaries inherent in the decisions of a human being such as an arbitrator or a county executive, it is hard to imagine how Love could have presented a stronger case. Under these circumstances, we must conclude that the preponderance of the evidence shows that if the defendants had protected Love's right to arbitration, Love more likely than not would have prevailed. Therefore, we reverse the trial court's conclusion that Love failed to prove that the defendants' negligence caused his injuries. The cause must be remanded for the trial court to determine the amount of damages and any other related issues.

We affirm in part and reverse in part the decision of the trial court and remand for further proceedings not inconsistent with this Opinion. Costs on appeal are to be assessed equally to the Appellant R. L. Love and his surety, and Appellees American Federation of State, County and Municipal Employees Local 1733 and Willie Joe Alexander.

 

 

_____

HOLLY M. KIRBY, JUDGE